**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **KENNETH SEARL,** | § | |
| **Plaintiff,** | § | |
| | § | |
| *v.* | § | Civil Action No. 3:14-CV-2572-N-BK |
| | § | |
| **CAROLYN COLVIN,** | § | |
| **Acting Commissioner of Social Security,** | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Pursuant to *Special Order 3*, the undersigned now considers the parties' cross-motions for summary judgment. For the reasons that follow, it is recommended that Plaintiff's *Motion for Summary Judgment*, Doc. 17, be **DENIED**, *Defendant's Motion for Summary Judgment*, Doc. 19, be **GRANTED**, and the Commissioner's decision be **AFFIRMED**.

## I. BACKGROUND[1]

### A. Procedural History

Plaintiff seeks judicial review of a final decision by Defendant denying his claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("the Act"). Plaintiff filed for DIB and SSI in February 2012, claiming that he became disabled in May 2002, though he later amended his onset date to November 15, 2011. Doc. 13-1 at 97-100; Doc. 13-3 at 66. Plaintiff's application was then denied at all administrative levels. Doc. 13-1 at 6-8, 12-14, 68-72, 77-82. Plaintiff now appeals to this Court pursuant to 42 U.S.C. § 405(g).

---

[1] The following background comes from the transcript of the administrative proceedings, Doc. 13, which is split among three documents, Doc. 13-1 to 13-3.

### B.  Factual Background

At the time of his alleged onset of disability, Plaintiff was 41 years old.  Doc. 13-1 at 113.

He has a GED and was previously employed as an athletic turf worker, machine tender, and

small products assembler.  Doc. 13-1 at 116; Doc. 13-3 at 78-80.  Plaintiff generally suffers from

schizoaffective disorder, panic disorder, and generalized anxiety disorder.[2]

From 2011 to 2013, Plaintiff was treated for mental health issues at Metrocare Services,

under the care of Dr. Patricia Newton.  Doc. 13-2 at 37.  In November 2011, Plaintiff presented

for a scheduled appointment and reported that he "continue[d] to feel depressed."  Doc. 13-2 at

37.  Dr. Newton prescribed diphenhydramine, Risperdal, and sertraline to treat Plaintiff's

depression, informing Plaintiff that he may not see immediate improvement.  Doc. 13-2 at 38.

By December 2011, Plaintiff stated that he was still depressed but "doing ok," and that he

believed his medications were effective.  Doc. 13-2 at 35-36.  In January 2012, Plaintiff appeared

somewhat equivocal during his examination by Metrocare personnel, answering "maybe" to

whether he had been depressed or had hallucinations, while also noting that he believed he was

"doing good."  Doc. 13-2 at 32.  In February 2012, Plaintiff told Metrocare personnel that he

sometimes "sees things, like spirits," but also reported that his "depression is getting better."

Doc. 13-2 at 25.

Over the course of Plaintiff's nearly two years of treatment by Metrocare personnel, his

medications were changed a number of times to address his specific needs.  *E.g.*, Doc. 13-3 at

38, 61.  Throughout this period, Plaintiff was observed to exhibit psychosis, hallucinations,

blunted affect, and depressed behavior.  *E.g.*, Doc. 13-2 at 25, 37; Doc. 13-3 at 31, 38, 43.  Yet

Plaintiff was also noted to be cooperative [Doc. 13-2 at 25, 31, 35, 37, 54; Doc. 13-3 at 23, 27,

---

[2]  Plaintiff also has numerous physical impairments, but only issues relating to his claimed
mental impairments were raised on appeal.

31, 34, 37, 43, 46, 50, 53, 56, 60], friendly [Doc. 13-3 at 25, 37; Doc. 13-3 at 27, 44, 53], normal

[Doc. 13-2 at 25, 37, 50, 52; Doc. 13-3 at 27, 34, 46, 53], and to show no signs of psychosis

[Doc. 13-2 at 25, 31, 35, 37, 54; Doc. 13-3 at 34, 46, 50, 53, 56, 60].  Plaintiff reported homicidal

ideation on some occasions, Doc. 13-2 at 28, 111; Doc. 13-3 at 44, 51, 57, 61, but denied it on

others, Doc. 13-2 at 21, 23, 25, 29, 32, 35, 37, 50, 52, 55; Doc. 13-3 at 24, 27, 31, 34, 38, 46, 53.

Plaintiff was observed to have a "hard time focusing" and difficulty concentrating on a few

occasions, but not to have difficulty concentrating on other occasions.  *Compare* Doc. 13-2 at 23-

24, *and* Doc. 13-3 at 44 (difficulty), *with* Doc. 13-2 at 55, *and* Doc. 13-3 at 24, 31, 38, 56 (no

difficulty).  Plaintiff was in many instances described as organized [Doc. 13-2 at 21, 25, 35, 37;

Doc. 13-3 at 27, 34, 46, 53], alert [Doc. 13-2 at 23, 25, 35, 37, 55; Doc. 13-3 at 24, 27, 31, 34,

38, 43, 50, 53, 56, 60], and oriented [Doc. 13-2 at 28, 32, 50, 52, 55; Doc. 13-3 at 31, 38, 43, 50,

56, 60].  Plaintiff was sometimes noted to be anxious or suffer from anxiety, Doc. 13-2 at 22, 24,

29, 55; Doc. 13-3 at 31, 38, but at other times he did not, Doc. 13-2 at 32; Doc. 13-3 at 24, 44,

50-51, 56, 57, 60.  Similarly, on some occasions, Plaintiff presented with racing thoughts, Doc.

13-3 at 32, 51, while at other times he did not, Doc. 13-3 at 24, 38, 44, 57.

On March 28, 2012, consultative examining physician Dr. Frank Crumley, M.D.,

completed a medical source statement on Plaintiff's mental impairments.  Doc. 13-2 at 103-07.

In recounting Plaintiff's medical history, Dr. Crumley noted that Plaintiff said he "has panic

attacks when he is in crowds with shortness of breath."  Doc. 13-2 at 104.  On Plaintiff's social

functioning, Dr. Crumley observed that Plaintiff has two friends but does not trust people, and

while he generally cannot deal with people, he is somewhat close to his relatives.  Doc. 13-2 at

104.  Dr. Crumley noted that Plaintiff does not finish tasks, as he is frequently distracted.  Doc.

13-2 at 104.  In his medical observations, Dr. Crumley stated that Plaintiff's thinking was

coherent and relevant, though illogical, and that he was preoccupied with depressive things and

paranoid thoughts.  Doc. 13-2 at 105.  He noted that Plaintiff stated he is "gifted" because he

"sees spirits of deceased relatives."  Doc. 13-2 at 105.  As to Plaintiff's sensorium, Dr. Crumley

noted that Plaintiff was oriented, could repeat six digits forward but reversed two digits, knew

the name of the president but not governor or mayor, could identify four past presidents as well

as his birthplace and birthdate, and could do simple addition and multiplication, though he

struggled with subtraction.  Doc. 13-2 at 105.  Dr. Crumley found Plaintiff's intelligence to be

"below average."  Doc. 13-2 at 105.  Based on all of his observations, Dr. Crumley diagnosed

Plaintiff with: (1) "Schizoaffective disorder, depressed, manifested by auditory and visual

hallucinations, paranoid delusional thought, . . . [and] decreased concentration;" (2) panic

disorder with agoraphobia; (3) generalized anxiety disorder; and (4) sleep disorder.  Doc. 13-2 at

106.  Dr. Crumley assessed Plaintiff with a global assessment of functioning ("GAF") score of

40.  Doc. 13-2 at 106.

   In April 2012, state agency consultant Dr. Matthew Turner, Ph.D., assessed Plaintiff's

mental residual functional capacity ("RFC") and found Plaintiff was not significantly limited in

the ability to carry out very short and simple instructions as well as the ability to make simple

work-related decisions, but found Plaintiff was moderately limited in his abilities to (1) maintain

attention and concentration for extended periods; (2) perform activities within a schedule; (3)

sustain an ordinary routine without special supervision; (4) work in coordination with others

without being distracted by them; (5) complete a normal workday and workweek without

interruptions from psychologically based symptoms; and (6) perform at a consistent pace without

an unreasonable number of rest periods.  Doc. 13-2 at 116-17.  Dr. Turner found Plaintiff

markedly limited, however, in the ability to understand, remember, and carry out detailed

instructions.  Doc. 13-2 at 116.  As to Plaintiff's social interaction, Dr. Turner found Plaintiff

was not significantly limited in the ability to ask simple questions or request assistance, maintain

socially appropriate behavior, and adhere to basic standards of neatness.  Dr. Turner found

Plaintiff was moderately limited in his ability to interact appropriately with the general public,

accept instructions and respond appropriately to criticism from supervisors, and get along with

coworkers or peers without distracting them or exhibiting behavioral extremes.  Doc. 13-2 at

117.  In making these observations, Dr. Turner opined that Plaintiff's alleged limitations were

not fully supported by the record.  Doc. 13-2 at 118.  Dr. Turner's RFC assessment was affirmed

by Dr. Susan Posey, psychologist, in July 2012.  Doc. 13-3 at 20.

   Dr. Turner also conducted a psychiatric review technique ("PRT") assessment of

Plaintiff.  Doc. 13-3 at 4-16.  Dr. Turner diagnosed Plaintiff with schizoaffective disorder,

generalized anxiety disorder, and a history of alcohol and cannabis abuse.  Doc. 13-3 at 6, 9, 12.

He assessed Plaintiff with mild restrictions in activities of daily living, moderate difficulties in

maintaining social functioning, moderate difficulties in maintaining concentration, persistence,

or pace, and no episodes of decompensation.  Doc. 13-3 at 14.  Dr. Turner noted that Plaintiff's

exam by Dr. Crumley was incongruent with his Metrocare psychiatric treatment.  Doc. 13-3 at

16.  Dr. Turner concluded that Plaintiff is somewhat limited by his psychiatric symptoms, but the

impact of these symptoms "does not wholly compromise the ability to function independently,

appropriately, and effectively on a sustained basis."  Doc. 13-3 at 16.  Dr. Turner's PRT

assessment was affirmed by Dr. Posey in July 2012.  Doc. 13-3 at 18.

   On May 3, 2012, Plaintiff presented to Metrocare personnel complaining that he had been

"out of medications for 1 month."  Doc. 13-2 at 55.  Plaintiff was encouraged to keep scheduled

appointments to stay medication compliant.  Doc. 13-2 at 55.  Two weeks later, Plaintiff was

noted to have a normal affect, normal mood, and to be medication compliant.  Doc. 13-2 at 52.

In July 2012, Plaintiff reported that he was tired because his sleeping medications were not

working, but denied insomnia.  Doc. 13-3 at 38.  In September 2012, Plaintiff presented as

"calm" and noted that his hallucinatory "shadows" were not as bad.  Doc. 13-3 at 34.  In October

2012, Plaintiff reported being depressed and hearing voices.  Doc. 13-3 at 31-32.   In November

2012, Plaintiff presented as "relaxed."  Doc. 13-3 at 27.   In January 2013, Plaintiff reported that

he was "fair" and, regarding his hallucinations, stated "its [sic] better."  Doc. 13-3 at 24.  In April

2013, Plaintiff reported that he was depressed and had no energy.  Doc. 13-3 at 44.  In May

2013, Plaintiff stated that he did not know how he was feeling, but noted that he did not hear any

voices since going on new medication.  Doc. 13-3 at 57.  In June 2013, Plaintiff commented that

he was "alright."  Doc. 13-3 at 53.  In July 2013, Plaintiff rated his mood as five on a ten-point

scale and stated he was having problems sleeping.  Doc. 13-3 at 50-51.  In August 2013, Plaintiff

reported running out of medications early because taking more chlorpromazine yielded better

results.  Doc. 13-3 at 60.

In July 2012, Plaintiff completed a function report.  Doc. 13-1 at 136-43.  Plaintiff stated

that he only goes outside when he has to go places and does not walk much.  Doc. 13-1 at 139.

He noted that he shops in stores for food and clothes, usually once a month.  Doc. 13-1 at 139.

He also stated he leaves the house to take the trash out, go to church, and go to the doctor, and

said he sometimes needs to be reminded to go places.  Doc. 13-1 at 140.  Plaintiff described his

social activities as watching television and talking with his family on a daily basis.  Doc. 13-1 at

140.  Plaintiff reported that he did not need to be accompanied when going out.  Doc. 13-1 at

140.  On getting along with people, Plaintiff stated that he has problems when people call him

"crazy or retardy" or when he feels disrespected, and that since his conditions began, he has tried

to keep to himself so people will not say as much to him.  Doc. 13-1 at 141.  Plaintiff rated his

ability to get along with authority figures as "very poor, bad understanding."  Doc. 13-1 at 141.

Plaintiff said he is fair at following written instructions and good at following spoken

instructions, and that he can pay attention for half an hour to an hour sometimes.  Doc. 13-1 at

141.

### C.   The ALJ's Findings

In March 2013, the ALJ issued a decision unfavorable to Plaintiff.  Doc. 13-1 at 12-14.

At step one, she found that Plaintiff had not engaged in substantial gainful activity since

November 15, 2011.  Doc. 13-1 at 17.  At step two, the ALJ found that Plaintiff had the

following severe impairments: history of left ankle fracture, status post open reduction and

internal fixation, history of gunshot wounds (remote in time), degenerative joint disease of the

lumbar spine, and schizoaffective disorder.  Doc. 13-1 at 17.  At step three, the ALJ found that

Plaintiff did not have an impairment that met or medically equaled the presumptively disabling

conditions listed in 20 C.F.R. Part 404, Appendix 1.  Doc. 13-1 at 17-18.  Specifically, the ALJ

found that Plaintiff's mental impairment caused only mild restriction in activities of daily living;

moderate restriction in social functioning; moderate restriction in concentration, persistence, or

pace; and he had no episodes of decompensation; thus, his impairment was not severe enough to

meet Listing 12.04.  Doc. 13-1 at 18-19.

The ALJ further found that Plaintiff retained the RFC to perform light work with the

following limitations: he can only occasionally bend, stoop, and crouch, but cannot squat, kneel,

or climb; the work should be routine, repetitive, and simple, but not complex or detailed; he can

follow one or two-step instructions; the work should not be collaborative in nature or require

team work; he can have occasional interaction with coworkers and supervisors and incidental

interaction with others; and due to primarily psychologically- based symptom flare-ups, Plaintiff would tend to be off task ten percent of the workday.  Doc. 13-1 at 19.  In so finding, the ALJ considered Dr. Crumley's opinion and assigned "little weight" to the low GAF score assessed by him because "the consultative examination was performed just subsequent to the time [Plaintiff] had been noncompliant in taking psychotropic medications as prescribed," making their effect minimal at most.  Doc. 13-1 at 24.  The ALJ also noted that Dr. Crumley's diagnoses of panic disorder with agoraphobia and generalized anxiety disorder were not supported by the treatment records of Dallas Metrocare Services.  Doc. 13-1 at 24.  At step four, the ALJ found that Plaintiff is unable to perform his past relevant work.  Doc. 13-1 at 24-25.  At step five, the ALJ found that, considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  Doc. 13-1 at 25.  Specifically, the ALJ found that Plaintiff can perform the jobs of laundry worker and photocopy machine operator.  Doc. 13-1 at 26.

## II.  LEGAL STANDARD

An individual is disabled under the Act if, *inter alia*, he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or can be expected to last for at least 12 months.  42 U.S.C. § 423(d)(1)(A).  Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th

Cir. 1995). Under this standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

The Commissioner uses the following sequential five-step inquiry to determine whether a claimant is disabled: (1) an individual who is working and engaging in substantial gainful activity is not disabled; (2) an individual who does not have a "severe impairment" is not disabled; (3) an individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors; (4) if an individual is capable of performing his past work, a finding of "not disabled" must be made; (5) if an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if any other work can be performed. *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. §§ 404.1520(b)–(f), 416.920(b)–(f)).

Under the first four steps of the analysis, the burden of proof lies with the claimant. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* If the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant can perform. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

## III.  DISCUSSION

### A.  The ALJ's Step 3 findings are based on substantial evidence.

Plaintiff argues that substantial evidence does not support the ALJ's Step 3 finding that

he had only moderate limitations in social functioning and maintaining concentration,

persistence, and pace.  Doc. 18 at 10, 12.  Plaintiff contends that his testimony at the

administrative hearing, Dr. Crumley's consultative exam findings, and Metrocare records

support extreme if not marked limitations in social functioning. Specifically, Plaintiff notes that

Metrocare records describe him as "suspicious" and "paranoid," and state "he prefers to be alone

whenever he can" and suffers from "violent conflict with others."  Doc. 18 at 8, 11 (citing Tr. at

189-90).  Plaintiff also notes a "history of homicidal ideation."  Doc. 18 at 11.

As to concentration, persistence, and pace, Plaintiff insists that he has significant

limitations in his short-term memory as manifested in his inability to perform rudimentary

arithmetic, and while he can name U.S. Presidents and his birthplace, his remote memory does

not speak to his ability to maintain concentration.  Doc. 18 at 12.  Plaintiff maintains that the

ALJ ignored Dr. Crumley's remark that Plaintiff was slow to answer proverbs and displayed

perceptual abnormalities, such as seeing and hearing spirits of the deceased.  Doc. 18 at 12-13.

Plaintiff asserts that Dr. Crumley diagnosed Plaintiff with decreased concentration.  Doc. 18 at

13.  Plaintiff also argues that the ALJ misread his function report, which indicates that he can

only "sometimes" pay attention for 30 minutes to an hour.  Plaintiff notes that even unskilled

work requires concentration for two-hour segments.  Doc. 18 at 13.  Plaintiff further contends

that Metrocare records indicate he complained of difficulty concentrating on several occasions

and was repeatedly positive for delayed speech response.  Doc. 18 at 14.

Defendant responds that the ALJ noted inconsistencies in the record, bringing into

question the general reliability of Plaintiff's self-reported symptoms.  Doc. 19-1 at 14.

Specifically, Defendant notes that despite Plaintiff's testimony about panic attacks,

hallucinations, and anxiety, such impairments either presented inconsistently or are absent from

treatment records altogether.  Doc. 19-1 at 14.  Defendant acknowledges that Plaintiff has some

difficulty in social functioning, but he interacts closely with his family, has two friends, and goes

to the store, church, and doctor.  Doc. 19-1 at 15.  As to concentration, persistence, and pace,

Defendant contends that Plaintiff himself stated that he could finish what he started most of the

time, and reported a fair ability to follow written instructions as well as a good ability to follow

spoken instructions.  Doc. 19-1 at 15.

Both Listing 12.03, for schizophrenic, paranoid, and other psychotic disorders, and

Listing 12.04, for affective disorders, require respective subsections (A) and (B), or subsection

(C), to be satisfied to meet the listings.  Plaintiff does not appeal any issue relating to subsections

(A) or (C), focusing only on the ALJ's decision regarding subsections (B)(2) and (B)(3), which

require marked difficulties in maintaining social functioning and in maintaining concentration,

persistence, or pace.  20 C.F.R. Pt. 404, Subpt. P, App'x 1 §§ 12.03-04.  "The claimant must

provide medical findings that support each of the criteria for the equivalent impairment

determination."  *Selders v. Sullivan,* 914 F.2d at 614, 619 (5th Cir. 1990).

Here, the ALJ's Step 3 decision regarding social functioning is supported by substantial

evidence.  At the outset, the Court notes that the only medical evidence of record that tends to

conflict with the ALJ's findings regarding Plaintiff's social functioning – treatment notes from

October 20, 2011 that indicate Plaintiff prefers to be alone, is prone to violent conflict with

others, and was suspicious and paranoid – predate Plaintiff's alleged date of onset, November 15,

2011.  Doc. 13-2 at 39-42; Doc. 13-3 at 66.  Of the evidence postdating November 15, 2011,

11

there are multiple instances of psychosis, hallucinations, blunted affect, and depressed behavior. *E.g.*, Doc. 13-2 at 25, 37; Doc. 13-3 at 31, 38, 43.  However, a large portion of the record either shows that these symptoms responded to treatment, *e.g.*, Doc. 13-2 at 55 ("paranoid sometimes"); Doc. 13-3 at 31 (positive for hearing voices but "its [sic] better"); Doc. 13-3 at 34 (on hallucinations: "shadows not as bad"), or were present on only an intermittent basis, *e.g.*, Doc. 13-2 at 25, 31, 35, 37, 54; Doc. 13-3 at 34, 46, 50, 53, 56, 60 (no signs of psychosis). Plaintiff was repeatedly noted to be "cooperative," Doc. 13-2 at 25, 31, 35, 37, 54; Doc. 13-3 at 23, 27, 31, 34, 37, 43, 46, 50, 53, 56, 60, "friendly," Doc. 13-3 at 25, 37; Doc. 13-3 at 27, 44, 53, and "normal," Doc. 13-2 at 25, 37, 50, 52; Doc. 13-3 at 27, 34, 46, 53.  Plaintiff was even noted to be "relaxed" on one occasion.  Doc. 13-3 at 27.  Moreover, Plaintiff's history of homicidal ideation is much more limited than he suggests, as treatment records repeatedly note his denial of homicidal ideation.  *Compare* Doc. 13-2 at 28, 111, *and* Doc. 13-3 at 44, 51, 57, 61 (homicidal ideation), *with* Doc. 13-2 at 21, 23, 25, 29, 32, 35, 37, 50, 52, 55, *and* Doc. 13-3 at 24, 27, 31, 34, 38, 46, 53 (no homicidal ideation).  Thus, on this record, the ALJ's determination that Plaintiff only has moderate limitations in social functioning is not so baseless as to be unsupported by substantial evidence.  *Greenspan*, 38 F.3d at 236.

The ALJ's decision as to concentration, persistence, and pace is likewise supported by substantial evidence.  Though some records indicate that Plaintiff has a "hard time focusing" and has difficulty concentrating, Doc. 13-2 at 23-24; Doc. 13-3 at 44, Plaintiff also repeatedly denied having any difficulty concentrating, Doc. 13-2 at 55; Doc. 13-3 at 24, 31, 38, 56, and was often noted to be "organized," Doc. 13-2 at 21, 25, 35, 37; Doc. 13-3 at 27, 34, 46, 53, "alert," Doc. 13-2 at 23, 25, 35, 37, 55; Doc. 13-3 at 24, 27, 31, 34, 38, 43, 50, 53, 56, 60, and "oriented," Doc. 13-2 at 28, 32, 50, 52, 55; Doc. 13-3 at 31, 38, 43, 50, 56, 60.  Plaintiff argues that Dr.

Crumley diagnosed him with decreased concentration, however, a review of the record reveals that Dr. Crumley's only detailed discussion of Plaintiff's ability to complete tasks appears to merely parrot what Plaintiff reported during his examination.  Doc. 13-2 at 104.

Plaintiff also points to inconsistencies in his function report that he contends belie the ALJ's conclusion that he can concentrate for an hour at a time.  Doc. 18 at 13-14.  However, upon review, the record does not reveal any such inconsistencies, only Plaintiff's self-reported "very poor" ability to get along with authority figures, and nothing directly relevant to his ability to focus on work tasks.  Doc. 13-1 at 142.  As with social functioning, while there is some evidence in the record to support Plaintiff's claim of marked difficulties, and there is other evidence to the contrary.  The bottom line is that these and any other conflicts in the evidence the ALJ must resolve and did resolve.  *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).  This Court is without facility to disturb the ALJ's decisions, as they are supported by substantial evidence.  Accordingly, Defendant is entitled to summary judgment on this ground.

**B.   The ALJ gave proper weight to Dr. Crumley's medical opinion.**

Plaintiff argues that, in discarding Dr. Crumley's opinion in favor of Dr. Turner's, the ALJ did not apply the legal standard set out in 20 C.F.R. §§ 404.1527 and 416.927.  Doc. 18 at 15-16, 18.  Plaintiff also contends that the ALJ's erred in discounting Dr. Crumley's opinion on her mistaken belief that Plaintiff was not taking his medication at the time Dr. Crumley examined him.  Doc. 18 at 15.  Plaintiff observes that Plaintiff's noncompliance with taking his medications that was noted by Metrocare on May 3, 2012, began on April 3, well after March 28, when his examination by Dr. Crumley occurred.  Doc. 18 at 16.  Plaintiff additionally insists that, contrary to the ALJ's conclusion, Metrocare records fully support Dr. Crumley's diagnoses of panic disorder with agoraphobia because the records indicate that Plaintiff was hallucinating,

spending time alone, was withdrawn, and suffering from anxiety and nervousness.  Doc. 18 at

16-17.  Plaintiff also asserts that Dr. Crumley's GAF assessment, if properly considered by the

ALJ, would have reflected that Plaintiff has far greater psychological limitations.  Doc. 18 at 19.

Plaintiff contends that Dr. Crumley's opinion is uncontroverted and, thus, the ALJ was not free

to reject it in favor of that of non-examining physicians such as Dr. Turner.  Doc. 18 at 17.

Defendant responds that a GAF score may have little to no bearing on an individual's

functioning and, in any event, the record as a whole demonstrated that Plaintiff had far greater

functioning, thus justifying the little weight given to the GAF score.  Doc. 19-1 at 16-17.

Defendant argues that Plaintiff has also failed to identify how his GAF score translated into

specific limitations on his ability to perform basic work activities.  Doc. 19-1 at 17.  Defendant

failed to address Plaintiff's arguments regarding Dr. Crumley's diagnosis of panic disorder with

agoraphobia.

When a treating or examining physician's opinion about the nature and severity of a

claimant's impairment is well-supported by medically acceptable clinical and laboratory

diagnostic techniques, and is not inconsistent with the other substantial evidence, the

Commissioner must give that opinion controlling weight.  *Newton v. Apfel*, 209 F.3d 448, 455

(5th Cir. 2000).  "The opinion of a specialist generally is accorded greater weight than that of a

nonspecialist."  *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994).  A treating physician's opinion

may be given little or no weight when good cause exists, however, such as "where the treating

physician's evidence is conclusory [or] is unsupported by medically acceptable clinical,

laboratory, or diagnostic techniques."  *Newton*, 209 F.3d at 455-56.

Nevertheless, "absent reliable medical evidence from a treating or examining physician

controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating

physician <u>only</u> if the ALJ performs a detailed analysis of the treating physician's views" under the criteria set forth in 20 C.F.R. § 416.1927.  *Id.* at 453 (emphasis in original).  Under that section, before the Commissioner may reject a treating doctor's opinion, he must consider the following six factors: (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support for the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician.  *Id.* at 455-56.  It is well settled that even though the opinion and diagnosis of a treating or examining physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status.  *Paul*, 29 F.3d at 211.

As an initial matter, the ALJ did not reject the entirety of Dr. Crumley's opinion.  Rather, she merely "assigned little weight to the low GAF score" because the examination "was performed just after Plaintiff "had been noncompliant in taking psychotropic medications as prescribed; thus, the effects of medication [were] minimal, at most."  Doc. 13-1 at 24.  The ALJ further noted that Dr. Crumley's diagnoses of panic disorder with agoraphobia and generalized anxiety disorder were not supported by Metrocare records, as there is "no mention of agoraphobia in those records."  Doc. 13-1 at 24.  While Plaintiff makes much of the ALJ's purported mistake in computing the dates of Plaintiff's medication noncompliance in relation to Dr. Crumley's examination of him, the treatment records he cites in support are not that specific.  Metrocare records from May 3, 2012, indicate that Plaintiff reported he had "been out of medications for 1 month."  Doc. 13-2 at 55.  Though Plaintiff construes this to mean he ran out of medications on April 3, 2012, no specific date is referenced.  Doc. 13-2 at 55.  Certainly, there is nothing that directly contradicts the ALJ's conclusion that Plaintiff had already ceased taking

his prescribed medication about a week before that, when Dr. Crumley calculated his GAF score. More importantly though, there is no evidence in the record that the GAF score Dr. Crumley assigned during the visit in question reflected his opinion that Plaintiff's ability to perform basic work activities was necessarily impacted.  *Davis v. Astrue*, No. 3:06-CV-0883-B, 2008 WL 517238 at *3 n.7 (N.D. Tex. Feb. 27, 2008) (Sanderson, J.) ("[F]ederal courts have declined to find such a strong correlation between an individual's GAF score and the ability or inability to work.").  Moreover, there are no other comparator GAF scores in the medical records to suggest either decompensation or improvement.

As to Dr. Crumley's diagnoses of panic disorder and generalized anxiety disorder, the medical records support the ALJ's findings and are replete with instances in which the Metrocare treatment notes are inconsistent with Dr. Crumley's assessment.  First, as Defendant notes, Metrocare personnel never diagnosed Plaintiff with panic disorder, agoraphobia, or anxiety disorder.  And, while treatment notes do indicate Plaintiff was anxious at times, there are just as many instances of Plaintiff denying any anxiety.  *Compare* Doc. 13-2 at 22, 24, 29, 55, *and* Doc. 13-3 at 31, 38 (anxiety present), *with* Doc. 13-2 at 32, *and* Doc. 13-3 at 24, 44, 50-51, 56, 57, 60 (no anxiety observed or anxiety expressly denied).  Likewise, while there is some evidence of Plaintiff having racing thoughts, there is more evidence that he was not afflicted with such condition.  *Compare* Doc. 13-3 at 32, 51 (racing thoughts), *with* Doc. 13-3 at 24, 38, 44, 57 (no racing thoughts).  Indeed, the <u>only</u> indication in the record that Plaintiff ever suffered from panic attacks is in Dr. Crumley's summarization of Plaintiff's self-reported history.  Doc. 13-2 at 104. In any event, the ALJ's opinion clearly addresses multiple factors from [Section 404.1527(c)](), such as the nature of the treatment relationship, the examination being performed when Plaintiff was off medication.  *See* Doc. 13-1 at 24 (discussing the support for Dr. Crumley's opinion

afforded by the medical evidence of record and the consistency of his opinion with the record as a whole).  That notwithstanding, the Court concludes that even if the ALJ's discussion of the Section 404.1527(c) factors was inadequate, Plaintiff was not prejudiced.  *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) ("Procedural perfection in administrative proceedings is not required" as long as "the substantial rights of a party have not been affected.").  A review of the evidence of record reveals that the ALJ's decision to afford Dr. Crumley's findings on anxiety and panic disorders little weight in concluding that Plaintiff was not disabled is supported by substantial evidence.

## IV.  CONCLUSION

For the foregoing reasons, *Plaintiff's Motion for Summary Judgment*, Doc. 17, should be **DENIED**, *Defendant's Motion for Summary Judgment*, Doc. 19, should be **GRANTED**, and the Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED** on September 9, 2015.

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

17

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE